UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 978-983-1030 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE US, INC. | Case No. 19-mj- 213-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Robert Lukacz, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for specified information about the cellular telephone assigned call number 978-983-1030 ("Target Cell Phone"), subscribed to Winfred PIMENTEL at 16 Custer Street, Lawrence, Massachusetts, and believed to be used by PIMENTEL, whose service provider is T-Mobile US, Inc., a service provider headquartered in Bellevue, Washington that receives legal process at 4 Sylvan Way, Parsippany, New Jersey. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. As described more fully in Attachment B, this application requests real-time data about the physical location of the Target Cell Phone including but not limited to E-911 Phase II data (or the specific latitude and longitude or other precise location information) for a period of thirty (30) days, as well as data about the historical physical location of the Target Cell Phone for the period of August 1, 2019 to the date of this affidavit.

1

2.      I am a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA") and have been so employed since September 2017. I have been a full time Police Officer since December 1998. I attended the 117th New Hampshire Police Academy and obtained my certification as a full time police officer. From December 1998 to June 2002, I was employed by the City of Portsmouth, New Hampshire as a full time police officer. From June 2002 to July 2003, I was employed by the Montgomery County, Maryland Police Department where I attended the full time Police Academy. From July 2003 to the present, I have been employed as a full time Police Officer by the City of Portsmouth, New Hampshire. Since September 2017, I have been assigned as a TFO with DEA's Portsmouth District Office Tactical Diversion Squad where my primary duties are to investigate the distribution of controlled substances including methamphetamine, heroin, fentanyl, and other substances in violation of state and federal drug laws, including Title 21, United States Code, Sections 841 and 846. As a DEA TFO, I have conducted and participated in physical and electronic surveillance, written and executed search warrants that have resulted in the seizure of controlled substances and the arrests of narcotics distributors, debriefed informants and reviewed recorded conversations and narcotics records. Additionally, I have attended narcotic and criminal investigation training classes including but not limited to those sponsored by the DEA.

3.      I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and state and local police departments. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit

contains the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that violations of Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances) have been committed, are being committed, and will be committed by the person using Target Cell Phone, and others unknown. I submit that there is also probable cause to believe, and I do believe, that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

5.      PIMENTEL was identified in connection with a DEA investigation of a fentanyl overdose death that occurred in Portsmouth, New Hampshire on September 13, 2019. That morning, Portsmouth police officers responded to an apartment where the deceased body was found of a person hereafter referred to as "Victim 1."[1] At the scene, officers located a bag containing an off-white powder substance consistent with the appearance of fentanyl, and a cellular telephone. Officers searched the telephone and confirmed that it belonged to Victim 1. Text messages were found in the telephone from the afternoon of September 12, 2019 between Victim 1 and a contact listed as "Pete" at telephone number 978-224-8399, as follows:

Victim 1:     Hey bro you free today

Pete:          Yea

Victim 1:     Ight cool if I meet you now?

---

[1] Autopsy and toxicology results have since been obtained confirming that Victim 1's cause of death was acute fentanyl toxicity.

3

| | |
|---|---|
| Pete: | Yea |
| Pete: | What you need |
| Victim 1: | 3 and same place? |
| Pete: | Yea |
| Victim 1: | Ight I'm heading to grab money from bank. I'll text you when I'm on route |
| Pete: | Ight |
| Victim 1: | I'm on route be there by 1:09 |
| Pete: | Ight |
| Victim 1: | Just got into town be there at 1:06 |
| Pete: | Ight |
| Victim 1: | Here |
| Pete: | Crossing the st |
| Victim 1: | Ight |
| Pete: | You in the same section ? |
| Victim 1: | Yea just new parking spot. Closer to the front you'll see me |

6.     Based on my training, experience, and familiarity with this investigation, I believe that in this conversation, Victim 1 is arranging a drug purchase in which he seeks to purchase three units of a drug from Pete in the same manner of a prior transaction that the parties had conducted. Victim 1's telephone call history shows three voice calls between Victim 1 and Pete on September 7, 2019, which is likely when the prior transaction occurred.

7.     On September 13, 2019, in an effort to identify the person responsible for selling the suspected fentanyl to Victim 1, law enforcement officers used Victim 1's telephone to

4

continue messaging with Pete. Pretending to be Victim 1, an officer sent a message to Pete at 978-224-8399, stating, "Hey good stuff yesterday buddy and I want to come down and get 3 more." The officer later stated that he would be coming with a friend and that they would therefore want six, rather than three. Ultimately, the officer arranged for his "friend," in actuality an undercover officer, to pick up six units for $220. The undercover officer made contact with Pete from a new number and facilitated a drug deal to occur at a residential complex located at 1821 Middlesex Street, Lowell, Massachusetts. The undercover officer went to the agreed-upon location and completed a hand-to-hand drug transaction with a male believed to be Pete, exchanging $220 in cash for a substance that was later determined via laboratory testing to be 5.9 grams of a substance containing fentanyl.

8. On September 15, 2019, Pete, using 978-224-8399, contacted the undercover officer's number and stated, "yo whats good" and "Heard something happened to [nickname for Victim 1]." The conversation continued and the undercover officer told Pete he would check what happened to Victim 1. Pete stated that he had heard that Victim 1 was "gone after Friday" and that he was therefore going to change telephone numbers. The undercover officer then received a message from a new number, 603-239-2373, indicating that this was Pete's new number.

9. On September 17, 2019, the undercover officer arranged to conduct another deal with Pete by contacting him at 603-239-2373. The undercover officer completed another transaction with the same male at a location in Lowell, Massachusetts a short distance from the prior deal location on Middlesex Street, purchasing another 6 grams of suspected fentanyl for

5

$220.[2] Following the deal, surveillance officers observed the male return to Middlesex Street and enter a residential building at 1835 Middlesex Street. Officers could not observe the specific unit but concluded that it was one of I, J, K, L, or M.

10. Queries of law enforcement databases showed that there was male subject named Winfred PIMENTEL associated with 1835 Middlesex Street, Unit K, Lowell, Massachusetts. Agents located a Facebook social media profile under the name "Winfred Pimentel Jr." and observed that the photos associated with the profile matched the appearance of Pete. Agents obtained Massachusetts driver's license information for PIMENTEL and confirmed that the driver's license photograph also matches the appearance of Pete. I therefore believe that the person listed in Victim 1's telephone as Pete and the person who conducted the transactions with the undercover officer is in fact PIMENTEL.

11. On September 25, 2019, the undercover officer arranged to conduct another deal with PIMENTEL by contacting him at 603-239-2373. The undercover officer arranged to purchase a whole "finger," referring to 10 grams of fentanyl, for $300, plus a sample of cocaine. Surveillance officers observed PIMENTEL depart 1835 Middlesex Street, Unit K, meet with the undercover officer in a parking lot to complete the transaction, and return to Unit K.

---

[2] Laboratory test results for substances seized in this investigation after September 13, 2019 are not yet available, but the substances purchased have been consistent in color, weight, consistency, and packaging with the drugs that they purport to be. As part of this investigation, law enforcement personnel have not conducted a presumptive field test of the suspected drugs which, for the reasons indicated above, there is probable cause to believe are controlled substances, as defined by the Controlled Substances Act of 1970, as amended, 21 U.S.C. § 801 *et seq*. The decision to not conduct such a test was due to the significant threat to law enforcement personnel, first responders, and members of the public of exposure to fentanyl, fentanyl-related substances, synthetic opioids, and other powders which may be composed in full, or in part, of one of these substances.

12. On October 2, 2019, the undercover officer arranged to conduct another deal with PIMENTEL by contacting him at 603-239-2373. The undercover officer arranged to purchase three fingers, or 30 grams, of fentanyl for $850. Before the time established for the deal, surveillance officers observed PIMENTEL depart 1835 Middlesex Street in a vehicle. Officers followed PIMENTEL into Lawrence, Massachusetts, where he appeared to pick up a child from school. Surveillance was interrupted for a period, but PIMENTEL was observed returning to 1835 Middlesex Street a short time later. Later that afternoon, the undercover officer arrived at 1835 Middlesex Street, located PIMENTEL sitting in a chair in front of Unit M, and completed the agreed-upon transaction.

13. On October 21, 2019, the undercover officer arranged to conduct another deal with PIMENTEL by contacting him at 603-239-2373. The undercover officer arranged to purchase 50 grams of fentanyl for $1,250. Surveillance units observed PIMENTEL depart the back door of 1835 Middlesex Street, Unit K, and meet with the undercover officer under the awning of unit M to complete the transaction. After the transaction, surveillance units observed PIMENTEL exit the front door of Unit K along with a woman.

14. Based on database queries and administrative subpoena responses, DEA personnel determined that 978-224-8399 and 603-239-2373 are both telephone numbers provided through the company Pinger, Inc. through a mobile device application called Sideline. Based on my training and experience and conversations with DEA personnel with expertise on this subject, I know that the Sideline application allows a mobile device user to obtain a second telephone number to be used on a mobile device along with the device's number assigned through the cellular service provider. In other words, a mobile subscriber can have one telephone number assigned through his cellular service provider, e.g., T-Mobile, and a second (or more)

telephone number accessed through the Sideline application on the same device. Based on my training and experience, I know that the use of such applications by those involved in drug trafficking is increasingly common, in part because it allows for compartmentalization of legal and illicit communications.

15. DEA personnel served administrative subpoenas on Pinger, Inc. for subscriber information pertaining to 978-224-8399 and 603-239-2373. Pinger provided a response stating that both numbers were associated with the same account number of 1121686617, which was registered under telephone number 978-983-1030 (the Target Cell Phone). In other words, both numbers used by PIMENTEL in furtherance of drug trafficking are associate with a single Sideline account, and the cellular service provider phone number associated with that account is assigned to the Target Cell Phone. DEA personnel determined that the Target Cell Phone number is subscribed with T-Mobile to PIMENTEL and has been active since April 19, 2018.

16. I therefore believe that PIMENTEL is the user of the cellular device subscribed with T-Mobile and assigned call number 978-983-1030, and that PIMENTEL has used that device to access the Sideline application, thereby enabling him to use telephone numbers 978-224-8399 and 603-239-2373 in furtherance of the drug trafficking activity described herein.

17. I therefore believe that the Target Cell Phone is presently being used to conduct communications in furtherance of PIMENTEL's distribution of controlled substances. Thus, tracking the Target Cell Phone will assist in surveillance and likely lead law enforcement to locations and persons involved in drug trafficking.

18. No tangible property, or wire or electronic communications, shall be seized pursuant to the warrant. To the extent the requested real-time tracking (GPS, cell site, or other) information may constitute stored electronic information under 18 U.S.C. §§ 2701-2711, it is

believed 18 U.S.C. § 2703(c)(1)(A) expressly authorizes the provision (by the service provider) and retention ("seizure") by agents of such information. To the extent it may not, there is reasonable necessity for the "seizure" of such information. 18 U.S.C. § 3103a(b)(2). Not allowing agents to retain the information so they may identify the user of the target phone and his/her location would defeat the only purpose of the warrant and render the warrant useless. No stored wire or electronic information shall otherwise be seized pursuant to the warrant.

19. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

20. I also know that T-Mobile can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target

Cell Phone on T-Mobile's networks or with such other reference points as may be reasonably available.

21. I also know that T-Mobile can collect cell-site data about the Target Cell Phone.

22. I also know that wireless providers such as T-Mobile typically collect and retain this data in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

23. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

24. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 90 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

25. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours. Moreover, because the warrant will be served on T-Mobile, which will then compile the requested historical records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

I declare that the foregoing is true and correct.

/s/ Robert J. Lukacz
ROBERT J. LUKACZ
TASK FORCE OFFICER
U.S. DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to before me this 24th day of October, 2019

_____
HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF NEW HAMPSHIRE

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number 978-983-1030 (the "Target Cell Phone") subscribed with T-Mobile US, Inc. to Winfred PIMENTEL at 16 Custer Street, Lawrence, Massachusetts, and believed to be used by PIMENTEL.

2. Records and information associated with the Target Cell Phone that are within the possession, custody, or control of T-Mobile, a wireless service provider headquartered in Bellevue, Washington and that receives legal process at 4 Sylvan Way, Parsippany, New Jersey.

## **ATTACHMENT B**

### Particular Things to be Seized

I.  **Information to be Disclosed by the Provider**

   A.  **Real-Time Location Information**

All information about the real-time location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

B.     **Historical Location Information**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period August 1, 2019 to October 25, 2019:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

## II.   Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. § 841.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.